NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
LAUREN RESTREPO (Cal. Bar No. 319873)
Assistant United States Attorney
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3825
     Facsimile: (213) 894-0141
     E-mail:    lauren.restrepo@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CELLULAR TELEPHONE | No. 2:19-MJ-02871 |
| | GOVERNMENT'S *EX PARTE* APPLICATION FOR A WARRANT AUTHORIZING THE DISCLOSURE OF PROSPECTIVE CELL SITE AND GPS INFORMATION AND REQUEST TO SEAL; AFFIDAVIT OF LOGAN BONIFAS |
| | **(UNDER SEAL)** |

The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby applies for a warrant requiring cellular telephone service provider(s) to furnish the Drug Enforcement Administration (the "Investigating Agency") with information relating to the following cellular telephones:

a.    323-217-4683, a cellular telephone issued by T-Mobile/Metro PCS ("Carrier"), with international mobile subscriber identity ("IMSI") number 310260162945793, subscribed to Madel Carmen Ramirez, 321 North Savannah Street, Los Angeles, California, 90033,

and believed to be used by JAIME RAMIREZ GUZMAN ("**Subject Telephone 1**"); and

      b.   747-276-8199, a cellular telephone also issued by the Carrier, with IMSI number 310260957690089,[1] and believed to be used by JAIME RAMIREZ GUZMAN and others unknown ("**Subject Telephone 2**" and, together with **Subject Telephone 1**, collectively referred to as the "**Subject Telephones**").

Specifically, authorization is sought to obtain prospective cell-site information, that is, information reflecting the location of cellular towers (cell-site and sector/face) related to the use of the **Subject Telephones** ("cell-site information"), as well as the physical location of the **Subject Telephones**, to include E-911 Phase II data and latitude and longitude data gathered for the **Subject Telephones**, including Global Positioning Satellite and/or network timing information, including Sprint's Per Call Measurement Data, Verizon's Real Time Tool, AT&T's Network Event Location System and T-Mobile's True Call data, and including information from such programs as Nextel Mobile Locator, Boost Mobile Loopt, Sprint/Nextel Findum Wireless, which will establish the approximate location of the **Subject Telephones**, and which information is acquired in the first instance by the Carrier ("GPS information"), at such intervals and times as the government may request, and the furnishing of all

---

[1] The subscriber records obtained from the Carrier for **Subject Telephone 2** did not include a subscriber name or address. This may be because **Subject Telephone 2** is a prepaid telephone. If so, subscriber information would not be available because telephone companies do not require the subscriber to provide identification when purchasing a prepaid cellular telephone because the fees are paid in advance.

information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively, for a period of 45 days.

The application is made in connection with an investigation of offenses committed by JAIME RAMIREZ GUZMAN and others known and unknown (the "Target Subjects"), specifically violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Target Offenses"), and is based upon the attached agent affidavit. There is probable cause to believe that federal crimes are being committed and that the information likely to be received concerning the approximate location of the **Subject Telephones**, currently within, or being monitored or investigated within, the Central District of California, will constitute or yield evidence of those crimes.

The information sought by this application first includes information about the location (physical address) of the "cell-sites" linked to the **Subject Telephones** at call origination (for outbound calling), call termination (for incoming calls), and, if reasonably available, during the progress of a call. This information, which is acquired in the first instance by the Carrier, includes any information, apart from the content of any communication, that is reasonably available to the Carrier and that is requested by the Investigating Agency, concerning the cell-sites/sectors receiving and transmitting signals to and from the **Subject Telephones** whether or not a call is in progress. This information is sought based on 18 U.S.C. § 2701 et seq. (the "Stored Communications Act"). The Stored Communications Act provides:

> A governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only[2] when the governmental entity --
>
>> (A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction[.]

18 U.S.C. § 2703(c)(1); see also Carpenter v. United States, ___ S. Ct. ___, 2018 WL 3073916 (June 22, 2018) (holding that a warrant is required to obtain seven or more days' worth of historical cell-site information).[3]

Prospective cell-site information is also sought based on the

---

[2] This section also provides other methods to compel disclosure, including via subpoena or court order. However, the government in this case is proceeding under the highest threshold, that is, obtaining a warrant as described in § 2703(c)(1)(A).

[3] The definition of terms in the Stored Communications Act makes clear that the "record or other information" that a court may order a provider to disclose to the government under Section 2703(c)(1)(A) includes both cell site and other location information. First, the Stored Communications Act expressly adopts the definition of statutory terms set forth in 18 U.S.C. § 2510. See 18 U.S.C. § 2711 ("As used in this chapter. . . (1) the terms defined in section 2510 of this title have, respectively, the definitions given such terms in that section"). Thus, the term "provider of electronic communication service" used in Section 2703(c) covers cellular telephone service providers, because 18 U.S.C. § 2510(15) defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Further, cell site and other location information is "a record or other information pertaining to a subscriber to or customer of" an electronic communications service – another term used in Section 2703(c) – because cellular telephone service providers receive and store the information, if sometimes only momentarily, before forwarding it to law enforcement officials. See In Re: Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone, 460 F. Supp. 2d 448, 457–60 (S.D.N.Y. 2006). Finally, this Court is a "court of competent jurisdiction" because it is a "district court of the United States (including a magistrate judge of such a court) . . . that . . . has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

authority of 18 U.S.C. § 3121 et seq. (the "Pen Register Statute").[4]
The government therefore also complies with the provisions of that
statute, including by providing the required certification by the
attorney for the government at the end of this application.
Pursuant to the Pen Register Statute, upon an application made under
18 U.S.C. § 3122(a)(1) a court "shall enter an ex parte order
authorizing the installation and use of a pen register or trap and
trace device anywhere within the United States, if the court finds
that the attorney for the Government has certified to the court that
the information likely to be obtained by such installation and use
is relevant to an ongoing criminal investigation."  18 U.S.C.
§ 3123(a)(1).[5]

     Cellular telephone companies routinely create and maintain, in
the regular course of their business, records of information
concerning their customers' usage.  These records typically include
for each communication a customer makes or receives (1) the date and
time of the communication; (2) the telephone numbers involved;
(3) the cell tower to which the customer connected at the beginning
of the communication; (4) the cell tower to which the customer was

---

[4] 18 U.S.C. § 3127(3) defines "pen register" as "a device or
process which records or decodes dialing, routing, addressing, or
signaling information transmitted by an instrument or facility from
which a wire or electronic communication is transmitted, provided,
however, that such information shall not include the contents of any
communication."  A "trap and trace" device is similarly defined for
any device or process which captures incoming data.  See 18 U.S.C.
§ 3127(4).

[5] While 47 U.S.C. § 1002, which is part of the Communications
Assistance for Law Enforcement Act of 1994 ("CALEA"), would preclude
seeking physical location information based on the Pen Register
Statute alone, the Stored Communications Act provides the requisite
additional authority for this Court to authorize the production by
the Carrier of cell-site information to the government.

connected at the end of the communication; and (5) the duration of the communication.   The records may also, but do not always, specify a particular sector of a cell tower used to transmit a communication.   Cell-site information is useful to law enforcement because of the limited information it provides about the general location of a cell phone when a communication is made.

This application also seeks GPS information for the **Subject Telephones**, which is sought based on 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41.   As discussed above, data that provides information about the location of a customer's phone falls within 18 U.S.C. § 2703(c)'s definition of "a record or other information pertaining to a subscriber to or customer of [an electronic communication service]."   Thus, the United States may obtain a warrant requiring a cell phone company to disclose GPS information "using the procedures described in the Federal Rules of Criminal Procedure," that is, Federal Rule of Criminal Procedure 41, as is contemplated by this application and order.

Some, but not all, cellular telephone service providers have the technical means to obtain GPS information.   GPS information is not generated specifically for law enforcement, but is the product of United States Federal Communications Commission requirements that cellular telephone service providers maintain and access location information for emergency responders.   To obtain GPS information, a "ping" (electronic signal) is sent to the cellular telephone, which unobtrusively activates the GPS chip in the telephone.   This information is not provided in a streaming fashion regardless of the cellular telephone activity, but instead is sent only in response to specific law-enforcement agency requests.   Location data through GPS

information can be delivered as accurately as within three meters; however, if the cellular telephone is in motion, such as while in a moving vehicle, the error range in meters may be greater, or the cellular telephone service provider may simply provide cell-site information.  In addition, the cellular telephone must be powered on and, usually, not in the middle of a telephone call, for GPS information to be obtained.  Moreover, if the cellular telephone is inside a building, or is in some other way blocked from the satellite, GPS information may not be obtainable.  In such cases, the service provider will often provide law enforcement with cell-site information instead.

This application also seeks authorization under 18 U.S.C. § 3103a(b), for reasonable cause shown, to delay any notification the government is required to give regarding the requested warrant to the subscriber(s) and user(s) of the **Subject Telephones** for a period of 30 days from the date that the disclosure ends.  18 U.S.C. § 3103a(b) states that any notice required following the issuance of a warrant may be delayed if, inter alia, the court finds reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result.  An adverse result is defined in 18 U.S.C. § 2705(a)(2) to include endangering the life or physical safety of a person, flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, or otherwise seriously jeopardizing an investigation or unduly delaying a trial.  Moreover, the Advisory Committee Notes for Fed. R. Crim. P. 41(f)(3) (2006 Amendments) state that delay of notice may be appropriate where "the officer establishes that the investigation is ongoing and that disclosure of the warrant will

compromise that investigation." The attached agent affidavit provides reasonable cause to believe that immediate notification of the execution of the warrant may have an adverse result. The proposed warrant both provides for the giving of such notice within 30 days after the date that the disclosure ends and prohibits, as part of the receipt of the requested information, the seizure of any tangible property or any other prohibited wire or electronic information as stated in 18 U.S.C. § 3103a(b)(2). As discussed in the attached agent affidavit, immediate notification of this warrant to the user(s) of the **Subject Telephones** may have an adverse result.

Similarly, pursuant to 18 U.S.C. § 2705(b) and 18 U.S.C. § 3123(d)(2), this application requests that the Court enter an order commanding the Carrier not to notify any person, including the subscriber(s) of the **Subject Telephones**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States, for the reasons outlined in the attached agent affidavit.

This application also seeks an order that: (1) authorizes the disclosure of the requested information whether the **Subject Telephones** are located within this District, outside of the District, or both, pursuant to 18 U.S.C. § 2703(c)(1)(A) and Rule 41(b), and, for good cause shown, at any time of the day or night pursuant to Rule of Criminal Procedure 41; (2) authorizes the disclosure of not only information with respect to the **Subject Telephones**, but also with respect to any changed telephone number(s)

assigned to an instrument bearing the same ESN, IMSI, or IMEI (hereinafter "unique identifying number") as the **Subject Telephones**, or any changed unique identifying number subsequently assigned to the same telephone number as the **Subject Telephones**, or any additional changed telephone number(s) and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same wireless telephone account number as the **Subject Telephones** within the period of disclosure authorized by the warrant; and (3) orders the Investigating Agency to reimburse the applicable cellular telephone service provider for its reasonable expenses directly incurred in providing the requested information and any related technical assistance.

Finally, this application requests that it, the proposed warrant that has been concurrently lodged, and the return to the warrant be sealed by the Court until such time as the Court directs otherwise.  Allowing disclosure to the public at large would likely jeopardize the ongoing investigation for the reasons outlined in the attached agent affidavit.

Dated: July 16, 2019            Respectfully submitted,

                                NICOLA T. HANNA
                                United States Attorney

                                BRANDON D. FOX
                                Assistant United States Attorney
                                Chief, Criminal Division


                                    _/s/ Lauren Restrepo_
                                LAUREN RESTREPO
                                Assistant United States Attorney

                                Attorneys for Applicant
                                UNITED STATES OF AMERICA

1

<u>CERTIFICATION</u>

2

In support of this application, and pursuant to 18 U.S.C.

3

§ 3122, I state that I, Lauren Restrepo, am an "attorney for the

4

Government" as defined in Rule 1(b)(1) of the Federal Rules of

5

Criminal Procedure.  I certify that the information likely to be

6

obtained from the requested warrant is relevant to an ongoing

7

criminal investigation being conducted by the Investigating Agency

8

of the Target Subjects for violations of the Target Offenses.

9

I declare under penalty of perjury under the laws of the United

10

States of America that the foregoing paragraph is true and correct.

11

12

13    _____7/16/2019_____          _____/s/ Lauren Restrepo_____

14    DATE                         LAUREN RESTREPO
                                   Assistant United States Attorney
15                                 General Crimes Section

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>AFFIDAVIT</u>

I, Logan Bonifas, being duly sworn, declare and state as follows:

I.   <u>PURPOSE OF AFFIDAVIT</u>

2.   This affidavit is made in support of an application for a warrant authorizing the disclosure of prospective cell-site information, as well as GPS information, as defined within the application, at such intervals and times as the government may request, and the furnishing of all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively, which disclosure will establish the approximate location of the following cellular telephones for a period of 45 days:

a.   323-217-4683, a cellular telephone issued by T-Mobile/Metro PCS ("Carrier"), with international mobile subscriber identity ("IMSI") number 310260162945793, subscribed to Madel Carmen Ramirez, 321 North Savannah Street, Los Angeles, California, 90033, and believed to be used by JAIME RAMIREZ GUZMAN ("GUZMAN") ("**Subject Telephone 1**"); and

b.   747-276-8199, a cellular telephone also issued by the Carrier, with IMSI number 310260957690089, and believed to be used by JAIME RAMIREZ GUZMAN and others unknown ("**Subject Telephone 2**" and, together with **Subject Telephone 1**, collectively referred to as the "**Subject Telephones**").

3.   I also seek authorization under 18 U.S.C. § 3103a(b), for reasonable cause shown below, to delay notification of the proposed warrant for a period of 30 days from the date that the disclosure ends.

4.     As described more fully below, I respectfully submit there is probable cause to believe that cell-site information, as well as GPS information, likely to be received concerning the approximate location of the **Subject Telephones**, will constitute or yield evidence of violations 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Target Offenses"), being committed by GUZMAN and others known and unknown (the "Target Subjects").

5.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

6.     I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct investigations of, and to make arrests for, the narcotics offenses enumerated in Title 18, United States Code Section 2516.

7.     I have served as an SA in this capacity since April 2019. I am currently assigned to the DEA's High Intensity Drug Trafficking Area ("HIDTA") division in Los Angeles.  Additionally, I am a member

3

of the HIDTA Opioid Response Team, HIDTA Group 45, which is tasked with the investigation of suspected opioid-related overdose deaths in Los Angeles County.  HIDTA Group 45 is comprised of DEA special agents and local law enforcement officers designated as Task Force Officers.

8.   As a SA, I received sixteen weeks of comprehensive, formalized instruction by the DEA at the Department of Justice Training Center to include such topics as drug identification, money laundering techniques, patterns of drug trafficking, methods of operation used by members of drug conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, de-coding drug related conversations, and other investigative techniques.

9.   Prior to my employment with the DEA, I was employed for three years by the Ohio State Highway Patrol as a State Trooper.  My work in drug investigations has included conducting and participating in physical surveillance, drafting and executing search warrants, and conducting arrests.  As a State Trooper, I interviewed narcotics users, buyers, sellers, manufactures, transporters, and informants, and I discussed with them various methods they use to safeguard their drug stashes and illicit proceeds and to avoid law enforcement detection.  Based on my training, knowledge, and experience, I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of monetary proceeds of drug trafficking.  I am also familiar with how digital devices are used to facilitate and conceal these crimes.  My experiences as a SA and State Trooper have allowed me to develop a

broad understanding of drug crimes, drug offenders, and the daily
operations and common practices of drug trafficking organizations.

### III. SUMMARY OF PROBABLE CAUSE

10.  On June 13, 2019, Rachel Marcella Smith was indicted in
the Middle District of Florida for conspiracy, and possession with
intent to distribute, fentanyl.  The Indictment relates to fentanyl
that was found during searches of Smith's car and house on or about
June 3, 2019.

11.  During post-arrest and post-indictment interviews with law
enforcement, Smith said that in May 2019 she obtained the fentanyl
(which she believed was heroin) from someone she knew as Jose
Ramirez (later identified as GUZMAN) while she was in Los Angeles,
California and that she still owed $10,000.  Text messages between
Smith and GUZMAN -- using **Subject Telephone 1**-- show discussions
regarding payment of the remaining $10,000, as well as an address in
Los Angeles, California where Smith could send the money owed.

12.  On or about June 26, 2019, an undercover DEA agent placed
a recorded call to **Subject Telephone 1** and spoke to a man who
identified himself as Jose (believed to be GUZMAN).  The two had a
discussion about the $10,000 Smith owed for the heroin/fentanyl and
confirmed that the money could be sent via the mail.

13.  The subscriber records for **Subject Telephone 1** list an
address that matches the address listed on GUZMAN's California
driver's license.

14.  After the recorded call with **Subject Telephone 1**, the UC
received additional text messages from **Subject Telephone 2** regarding
the $10,000 that Smith owed to GUZMAN for the heroin/fentanyl.

IV. <u>STATEMENT OF PROBABLE CAUSE</u>

15.   Based on my review of law enforcement reports and court documents, conversations with other law enforcement agents who were involved in this investigation, and my own knowledge of the investigation, I am aware of the following:

A.   <u>Complaint and Indictment filed against Rachel Marcella Smith for Fentanyl Distribution</u>

16.   On June 13, 2019, and after the filing of a criminal Complaint, Smith was indicted by a federal grand jury sitting in the United States District Court for the Middle District of Florida for conspiracy, and possession with intent to distribute, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 846 (Case No. CR 19-258-MSS-AAS).  The Complaint and subsequent Indictment relate to Smith's possession, on or about June 3, 2019, of over 400 grams of a mixture and substance containing fentanyl that was found during searches of her car and residence, located in St. Petersburg, Florida.

17.   As detailed more fully in the Complaint, on May 21, 2019, based on information received from a fentanyl overdose victim and a confidential source (the "CS"), St. Petersburg Police Department ("SPPD") officers as well as DEA agents conducted a controlled purchase of approximately one gram of heroin (later confirmed by laboratory tests to contain both heroin and fentanyl) by the CS from Smith.  Several days later, on or about June 3, 2019, a second controlled purchase was set up between the CS and Smith for two grams of heroin.  Once Smith arrived at the second meet location, Smith was arrested, her car was searched, and two bags containing

approximately two grams of suspected heroin/fentanyl were found.  A field test was done which confirmed the substances tested positive for fentanyl.  During a subsequent Mirandized interview, Smith consented to a search of her residence where officers found, among other items, a bag containing 709 grams of suspected heroin/fentanyl (later confirmed by laboratory tests to contain acetyl fentanyl and fentanyl).

B.    Post-Arrest Mirandized Interview of Smith and Investigation of **Subject Telephone 1**

18.    Based on law enforcement reports and conversations with other DEA SAs involved in this investigation, I have learned that on or about June 3, 2019, during a post-arrest Mirandized interview with law enforcement, Smith stated that in May 2019 she obtained what she believed was one kilogram of heroin from someone she knew as Jose Ramirez (later identified as GUZMAN) while she was in Los Angeles, California, for approximately $1,100 per ounce.  Smith said she met Ramirez at the Royal Pagoda Motel, located at 995 N. Broadway, Los Angeles, California, and described Ramirez as a Hispanic male in his 50s or 60s.  Smith said that she could not remember how much she paid Ramirez but believed she still owed him approximately $10,000.

19.    When asked about the two grams of suspected heroin/fentanyl found in her car (which field-tested positive for fentanyl) and the baggie of suspected heroin/fentanyl (later confirmed to contain acetyl fentanyl and fentanyl) found in her house, Smith stated they came from the kilogram of what she believed to be heroin that she obtained from Ramirez in May 2019 in Los Angeles, California.

20.  During the interview, Smith was given access to her cell phone and showed agents text messages between herself and **Subject Telephone 1**.  In the text messages, the user of **Subject Telephone 1** discussed where Smith could send that the money she owed.  One of the text messages gave a name and address where Smith should send the "papers."  Specifically, the text messages stated that Smith could send the "papers" to Alejandro Flores and 3242 Hill St., Huntington Park, California (the "Hill Street Address").  Based on my training and experience, I know that the term "papers" is a word commonly used by drug traffickers to refer to money.  Upon questioning, Smith explained that prior to obtaining what she believed to be heroin from the person she knew as Ramirez, she had purchased one ounce quantities of heroin from Alejandro Flores and that in May 2019 she learned that Ramirez was Flores's source of supply.

21.  Between June 3, 2019 and June 5, 2019, a DEA Intelligence Analyst conducted a search of law enforcement databases and learned that GUZMAN was listed as a suspected user of **Subject Telephone 1**.  The DEA analyst searched a California Department of Motor Vehicles ("DMV") database and determined that GUZMAN's DMV records list his home address as 321 North Savannah Street, Los Angeles, California, 90033.  The DMV records also included a driver's license photograph of GUZMAN.

22.  On or about June 4, 2019, subscriber records were obtained for **Subject Telephone 1**, which listed the subscriber as Madel Carmen Ramirez at 321 North Savannah Street -- the same address listed as GUZMAN's residence on his California DMV records.

23.   On or about June 5, 2019, prior to her initial appearance, DEA SA Lindsay Shaffer met briefly with Smith again.  SA Shaffer told Smith she was still under <u>Miranda</u> and showed Smith a California driver's license photo of GUZMAN.  Smith positively identified GUZMAN as the man she knew as Jose Ramirez, whom she met in May 2019 at the Royal Pagoda Motel in Los Angeles to obtain what she believed was heroin.

C.   <u>June 25, 2019 Interview of Smith</u>

24.   On June 25, 2019, Smith, accompanied by Defense Investigator Martin Enterlin, met with SA Shaffer and a SPPD officer at the Pinellas County Jail.  The interview was conducted for the purpose of gathering further information and intelligence regarding GUZMAN and his organization.

25.   During this interview, Smith stated that the first time she met GUZMAN was in May 2019 during her trip to Los Angeles and that GUZMAN was introduced to Smith through Flores.  Smith also stated that GUZMAN provided her with approximately one kilogram of what she believed was heroin and that once she obtained the kilogram from GUZMAN, and prior to leaving Los Angeles, she mailed it back to an address in St. Petersburg, Florida.  Smith also said that GUZMAN told her to text "777" to **Subject Telephone 1** when she was ready to purchase more narcotics.

D.   <u>Undercover Contacts with **Subject Telephone 1**</u>

26.   On June 26, 2019, a DEA SA, acting in an undercover capacity (the "UC"), placed a call to **Subject Telephone 1** and thereafter had a conversation in Spanish with a man who called himself Jose (believed to be GUZMAN).  On or about June 9, 2019, I

reviewed the Spanish to English summary of this recorded call and I learned the following:

27. During the call, the UC advised Jose that he was calling on behalf of the "misses" (referring to Smith) because the UC had been told that there was some money owed. Jose confirmed, and the two discussed how to send the money to Jose. The UC asked if Jose wanted it sent in the mail or in cash and Jose responded that either way was not a problem. The UC told Jose that he was given an address in Huntington Park (referring to the Hill Street Address previously sent to Smith from **Subject Telephone 1**) and asked if that address was correct. Jose confirmed it was. The UC asked if it would be 10 papers to which Jose responded, yes. The UC said okay, that he would call back if there were issues, and that the UC would send the paper in the mail. Based on my training and experience and knowledge of this investigation, I believe "papers" refers to U.S. currency and that "10 papers" refers to $10,000 -- the amount Smith said she owed GUZMAN for the one kilogram of what she believed was heroin.

E.   Text Messages between the UC and **Subject Telephone 2**

28. Later on June 26, 2019, after the UC's call with **Subject Telephone 1**, the UC received text messages **Subject Telephone 2**, from someone purporting to be a friend of "Jose's." On or about June 9, 2019, I reviewed the Spanish to English translation of these text messages and learned the following:

a.   During the text message exchange, the user of **Subject Telephone 2** said he was "Jose's friend, the one you talked to a bit ago" and noted that his name was also Jose. The user of **Subject Telephone 2** then asked the UC, "How did you get my friend's

information?" and the UC responded "the lady."  During the exchange
the person also asked, "How much do you owe? She had to have told
you" and the UC responded "10."  The person then stated, "10? I
don't think so" and the UC responded, "That's what she said. Is it
less?"  The person then responded "Tell her that's fine. She knows
how to find me."

b.  Based on my training and experience, and
conversations with other law enforcement agents, I believe that the
user of **Subject Telephone 2** reached out to the UC following the UC's
telephone call with **Subject Telephone 1** in an attempt to further
verify that the UC actually knew Smith and to further discuss and
coordinate a money shipment from the UC to GUZMAN for payment of the
outstanding $10,000 Smith owes GUZMAN for the one kilogram of
heroin/fentanyl.

29.  On or about July 12, 2019, I obtained subscriber records
for **Subject Telephone 2**.  The subscriber records did not contain a
subscriber name or address.  While not clear from the records, this
could be because **Subject Telephone 2** is a prepaid telephone.  Based
on my training and experience, I know that subscriber information is
not always available for prepaid telephones because telephone
companies do not require the subscriber to provide identification
when purchasing a prepaid cellular telephone because the fees are
paid in advance.

30.  Based on my review of law enforcement reports,
conversations with other law enforcement agents involved in this
investigation, the multiple interviews with Smith, and the recorded
calls and text messages between the UC and the **Subject Telephones**,
and my own knowledge of the investigation, I believe the **Subject**

**Telephones** are being used to facilitate heroin and fentanyl sales in the Central District of California, and elsewhere, as well as to facilitate the collection of the proceeds from drug sales.

31. I seek prospective cell-site/GPS information via this application because this information will assist me in gathering evidence in the ongoing investigation I have described above in the following ways: (1) I am investigating a conspiracy, and determining concert of action and contact between the conspirators is of value to my investigation; (2) the information will enable me to identify members of the conspiracy that I have not previously identified; (3) the information will provide insight into the roles and actions of the members of the conspiracy, and the criminal conduct committed by the people being investigated; (4) it will provide information regarding whether the individuals being investigated meet or have contact prior to, or after, committing any criminal conduct; (5) it will more readily provide information about any victims of the criminal conduct; and (6) the information will often identify locations where evidence is stored and where search warrants may be appropriate. Moreover, it will assist in targeting surveillance conducted in this case, and reduce the risk of being detected and revealing the nature or fact of the investigation. People who are involved in criminal activity are often conscious of being followed and keep a close eye out for surveillance units. The chance of being discovered increases with the more surveillance that is done and the closer the surveillance units must get to the target subjects. Use of the prospective cell-site/GPS information enables the investigative team to be more focused and judicious in its use of surveillance to those times when it appears that events of

significance are going to occur.  It also enables the investigative team the ability to conduct surveillance at a greater distance, because the fear of losing the target is reduced when surveillance is maintained via GPS/cell-site information.

## V.   GROUNDS FOR SEALING AND DELAYING NOTICE

32.  Based on my training and experience and my investigation of this matter, I believe that reasonable cause exists to seal this application and warrant, as well as the return to the warrant.  I also believe that reasonable cause exists to delay the service of the warrant by the Investigating Agency as normally required for a period of 30 days beyond the end of the disclosure period pursuant to 18 U.S.C. § 3103a(b) and, pursuant to 18 U.S.C. § 2705(b), to enter an order commanding the Carrier not to notify any person, including the subscriber(s) of the **Subject Telephones**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in: (1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing the investigation.

33.  Furthermore, there is good cause for the warrant to be issued such that the information may be provided to law enforcement at any time of the day or night because in my training and experience, and knowledge of this investigation, the subjects of the

13

investigation do not confine their activities to daylight hours, and it is often even more difficult to conduct surveillance at night.

## VI. CONCLUSION

34.   For all of the above reasons, there is probable cause to believe that prospective cell-site information, as well as GPS information, likely to be received concerning the approximate location of the **Subject Telephones**, currently within, or being monitored or investigated within, the Central District of California.

_____
Logan Bonifas, Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me
this ـــــــ day of July, 2019.

_____
UNITED STATES MAGISTRATE JUDGE

14